## J. E. Downes v. Thomas Self.

### Decided March 13, 1902.

**1.—Sale—Fraudulent Representations—Immaterial Statement.**

Where plaintiff sued to cancel a sale by him to defendant of certain shares in an oil mill, alleging that defendant represented that no one else was interested with him in the purchase, but plaintiff did not testify that this induced him to sell, but only that he did not think he would have made the trade that evening had he known that another was interested, such representation, though false; was immaterial.

**2.—Same—Matter of Opinion.**

Since the earnings of an oil mill are necessarily dependent upon many contingencies, any statement as to what such earnings will be, made before one-half of the season's output of the mill has been disposed of, must be regarded as an expresion of opinion, and not as a representation of facts.

Appeal from Houston. Tried below before Hon. John Young Gooch.

*Adams & Adams* and *Aldrich & Lipscomb,* for appellant.

*Nunn & Nunn,* for appellee.

PLEASANTS, ASSOCIATE JUSTICE.—Appellant brought by this suit to cancel a sale of certain shares of stock in the Crockett Oil Mills and Manufacturing Company, made by him to the appellee. The ground upon which the sale was sought to be set aside was the alleged false and fraudulent representations made by appellee to appellant as to the value of the stock, and as to whether or not any other person was interested with him in the purchase of same, on which representations appellant claims to have relied. The petition prays for a decree canceling the sale and requiring the surrender of the stock to appellant, and in the alternative for a judgment against appellee for damages in the sum of the difference between the price paid appellant by appellee for said stock and the actual value of the stock on the day of the sale.

The appellee answered by general and special exceptions and general denial, and especially denied making any false representations to plaintiff of any matter of fact or of any condition or thing affecting the value of said stock to induce him to sell same. The answer further avers that plaintiff as a stockholders of said oil company had full access to the books and bank account and had every opportunity that was possessed by the defendant to learn the condition and prospects of the said company, "and this defendant then presumed that he, the plaintiff, had full information, so far as the nature of the subject admitted of definite knowledge, and was as well capacitated to judge of the speculative profits and losses of the business for the balance of the season as this defendant was, and further this defendant says and avers that it was not possible, at the time of the transaction in question, for any person to estimate with any degree of accuracy how much profits would be made out of the business of that season, both because the future price of products could not then be known, nor was there any means by which any correct estimate of the amount of seed on hand and not worked up could be made, nor could it be foretold how much seed could thereafter be bought, and at what price, nor the yield the same would make, or the price of the product; such matters being purely speculative and no more than guess work, or at best, opinion, about which men of experience on such matters naturally differed; therefore it is not possible that this defendant could have given any valid opinion on such matter, and this fact was well known to plaintiff, as this defendant will prove, nor was plaintiff influenced by any such consideration in selling his stock; further, this defendant denies giving any such opinion as alleged by plaintiff."

The trial in the court below by a jury resulted in a verdict and judgment for the defendant, from which judgment the plaintiff below prosecutes this appeal. The circumstances attending the sale of the stock and the statements and representations made by the defendant to in-

duce plaintiff to make the sale are thus stated by the plaintiff on his direct examination as a witness in his own behalf:

"I sold my stock to defendant, Tom Self, about January 8, 1900, at 95 cents on the dollar, amounting to the sum of $950. The circumstances attending the sale were as follows One evening about dark we had the lights on and were fixing to close up. This was about January 9th, 10th, or 11th. I keep my office in the back part of Jim Brown's store. We were putting away our books, about dark, and Mr. Self walked in and walked all the way back where I was, and I spoke to him and asked him if I could do anything for him, and he said he came around to see if I wanted to sell my stock in the oil mill, and I said 'I don't know what it is worth.' He said he had bought some stock not long before that for 80 cents. I said, 'You have had business all your own way over there this season, and you ought to make some money.' He said, 'No, sir; we won't make a great deal; we owe several thousand dollars to the bank and about $2000 or more to Le Gory & Mayes.' I said, 'How much do you owe Le Gory & Mayes?' He said something over $2000. I said, 'You won't pay a very good dividend this year, then.' He said, 'No; we owe a great deal and will have to have some improvements made. You will remember that I talked to you about putting in a press;' and I said yes. He said all of the directors favor it, and that he thought it would be actually necessary to put in these improvements. I said, 'Now, Mr. Self, why do you want to buy this stock if you think it isn't going to declare a dividend or pay anything? What do you want it for?' And he gave me as a reason that he was owning some of the stock in the mill and wanted some more so that he could hold his job there; and I said, 'You are not going to be turned off.' And he said, 'I may be turned out, and I am satisfied if I can just hold my job.' I said, 'Now, if you don't put in that press what do you think the dividend will be?' 'Well,' he said, 'if we don't have any bad luck we may pay a 10 per cent dividend, if we don't put in valuable improvements.' He said that it required a whole lot of improvements that will cause expenditures, and I understood him to say they owed other debts, but that was the only one he mentioned. He stated what dividends it would pay in answer to my question. I asked him all about it. Finally I said, 'Well now, Self, you have worked that thing up and I had rather you would have my stock than anyone else.' I never had any dealings with him and he never came around to the store before, a I remember, but then from what I had heard he had done good work over there. I said, 'If there was not going to be any dividends, and I can't get any money out of it, I will take it out;' and he led me to believe that if the press was put in there would be no dividend, and he gave me to understand it would be put in and there would be no dividend; and I said, 'If that is the case I had rather sell to you than anybody else, and you can have it, if that is all it is worth, for 95 cents cents on the dollar. And he said, 'All right; I think I can get the money from Le Gory, and if I can I will see you later.' I

said, 'Hold on there a minute. Is Mr. Le Gory or anyone else in this deal with you?' He said, 'No sir; he is in no way interested. He is only furnishing me the money.' I remember distinctly that he said he was not interested. I thought that Gus Le Gory, being a director, and furnishing the money, there might be something up, and I stopped him and asked him. Mr. Self went out, and came back and said, 'Le Gory will be in in a minute and pay it,' and Gus came in and said something about paying me the money in the morning, but anyhow Gus said, 'Jim (speaking to Jim Brown), just write a check and I will sign it,' and I just got the stock out of the safe. It was in ten or twelve pieces. I handed the stock to Mr. Self, and said, 'Self, you write the transfer,' and he took the stock and wrote there, 'Transferred for value received to Tom Self.' There was no one else's name in there at the time but Self's, and he told me that no one had any interest in it but himself. I knew the position that John Le Gory had at the oil mill, and if I had known of his interest in the matter I don't think I would have closed the sale that evening at least. Gus Le Gory is the president of the company, and Self said, 'I will see Mr. Le Gory and get the money.' I said, 'Self, is Gus Le Gory interested with you in this purchase?' and he said no; and I asked then if anybody was interested and he said no, and that he didn't believe there would be any dividend. The secretary and some of the directors told me that they declared a 50 per cent dividend. This was several months after I sold. They never did publish it in the papers. I didn't know anything about the financial condition of the oil mill. I had not been in a position to know anything about it. All I knew was hearsay. I was at a meeting in June the year before, and we met up here and I was elected chairman, and the directors asked for time to make a report. They were to have made a report on the preceding year's business. Anyhow, they elected me chairman of the stockholders' meeting that day, and I called on the directors for a report, and they said they were not ready to make any report. I never saw any report. I regarded Mr. Self as manager and superintendent of the mill. He was one of the directors. I suppose the directors could have control of the management of the mill, but my experience is that the man over at the mill generally runs it. Mr. Self got a little over $1500 for the management of the mill and looking after the business of the mill. He told me himself he was getting good pay. My place of business is on the east side of town and the oil mill is out there between one-half and three-quarters of a mile. I don't believe that I have been in the office of the mill over three times. It is about half a mile from the principal business part of the town. The bookkeeper's office was over there at the mill. The manager stayed over there at the mill. If I had wanted information I should have gone to Mr. Self, for I don't think the other directors know anything about it. They had the management of the mill and put him over there to look after it. The other directors do not get any pay. I was over there one day and he was showing me what they had done. I had entire

confidence in Mr. Self. I believed his statement to me about the indebtedness of the mill and the dividend it would pay. Mr. Self said they had paid a right smart on what they owed Le Gory & Mayes, but still owed them something over $2000. The dividend which is paid would determine the value of the stock, in my judgment. If the mill was making money the stock would be worth more than if they were not making any. I regard stock worth whatever the dividend is. Stock that pays 10 per cent dividend is worth par. If it paid 20 per cent dividend it would be worth $1.10. If it earned a 50 per cent dividend it would be worth three or four to one. If I had stock of $100 which would draw $50, it would be worth $400. If I had known what dividend would be paid on my stock at the time I sold I would not have taken two for one. When I was connected with the mill we began to buy seed in August, and bought a good many in September. The big months were October, November, and December. They commence grinding about the 1st of October. The bulk of the seed are bought in October, November, and December. I relied upon the statements made to me by Mr. Self about the mill. I never mentioned selling my stock for five or six months before that, and I want to explain right here that I came up here to the stockholders' meeting and the directors were not ready to report, and I then said I believed I would sell out. In making the sale to Mr. Self I had no absolute knowledge of the affairs of the mill, and therefore relied upon Mr. Self's statements. They were what induced me to sell. He came in hunting me up when I was not thinking of selling. I had been drumming seed for the mill all the fall. The stock had been low previous to that. I had heard that it sold very low before that. I believe Mr. Self told me that he had bought some as low as 30 cents. I am sure he did. I do not know what the actual indebtedness of the mill to Le Gory & Mayes was at the time of the sale. Only Jim Brown, Tom Self, and I were present when the sale was made and no one else heard the conversation—until Le Gory came in with Self."

The undisputed evidence in the record establishes the following facts: The defendant Self was the superintendent of the oil mill, and directed its mechanical operation, but had no authority as general manager of the business of the company. He was a member of the board of directors and was also a member of a committee of three whose duty it was to make purchases of seed and sales of the product of the mill. John Le Gory was bookkeeper for the mill, and he and Self agreed to buy up some of the stock provided they could borrow the money to pay for same. They made arrangements with Le Gory's father to furnish the money and bought about 100 shares. Plaintiff's stock was the first stock purchased by them. No daily record of the operations of the mill was kept, and it was impossible to tell with any certainty on the 8th day of January, 1900, what amount of seed or of manufactured product was on hand, nor could it have been known with any degree of certainty what quantity of oil could be produced from the seed on hand. As a matter of fact, the defendant, when making arrangements with Mr. A. Le Gory

to borrow money with which to purchase stock, estimated the amount of seed on hand at 275 to 300 tons less than the actual amount. (The defendant testified that he thought the mill would pay a 10 or 15 per cent dividend, but that this would be consumed in making repairs and paying the debts due by the mill.) At that time the mill owed to the bank at Crockett $7813.08; to Mayes & Le Gory, $1900 or $2000, and other indebtedness amounting to $3000. For some time prior to the 8th of January the matter of putting in improvements costing $3000 or $3500 had been under consideration by the board of directors and was pending at that time. Self was in favor of making the improvements, and when the dividend was finally declared it was done by a divided board, some of whom favored putting the money in improvements, except a dividend of 10 per cent. The stock of the oil company is not shown to have had a market value on January 8, 1900. None of said stock had prior to that time sold for as much as defendant paid for plaintiff's. After the 8th of January, 1900, cotton seed meal advanced in price $1.50 per ton and oil from 2 to 3 cents per gallon. Prior to this time the mill had contracted 25,000 gallons of oil at 24 cents per gallon, but only a portion of it had been delivered. The price of oil advanced within a few days after January 8th to 30 cents per gallon, and the balance of the product of the mill was sold at that price. Self did not know the price of oil at the time he bought plaintiff's stock; he thought then it was worth about 26 cents, but was not receiving quotations at that time, because the mill had shortly before sold 25,000 gallons, only a part of which had been delivered, and was not then bothering about market prices. On the 8th of January, 1900, the market price of oil was 28 cents per gallon. Usually all the cotton seed obtainable for the manufacture of oil is sold before the 1st of January, but after the purchase of plaintiff's stock the mill unexpectedly procured 260 tons of seed. The oil produced by the mill after the purchase of plaintiff's stock amounted to 36,000 gallons, which as before stated was sold for 30 cents per gallon. On April 16, 1900, the board of directors declared a dividend of 50 per cent.

We are of opinion that this evidence wholly fails to sustain plaintiff's allegations that he was induced to sell his stock to the defendant by false and fraudulent representations made to him by the defendant, and that no other verdict than one in favor of the defendant could have been properly rendered upon such evidence. An examination of plaintiff's testimony shows that the only representations made to him by the defendant were that he did not think the oil company would make a great deal that season; that it owed about $2000 to Le Gory & Mayes and several thousand to the bank, and would have to make some improvements; that if the improvements were not made and the mill had no bad luck it might make 10 per cent; and that no one was interested with him in the purchase of the stock. The undisputed evidence shows that the representations as to the indebtedness of the mill and the necessity for and probability of spending several thousand dollars in improve-

ments were true. Admitting that the statement that no one was interested with him in the purchase of the stock was false, plaintiff does not claim that such statement induced him to make the trade, nor that he would not have sold his stock to Self if he had known that Le Gory was interested with him in its purchase, but only testifies that if he had known this fact he does not think he would have made the trade that evening. This representation as to no one being interested with him in the trade being immaterial, it only remains for us to consider whether the statement of defendant, as to what he thought the dividend on the stock would be, is such a false representation as would entitle plaintiff to a rescission of the sale. We think there is nothing in the evidence to show that the statement of defendant as to what he thought would be the probable dividend earned by the mill for that season was not an honest and truthful expression of his opinion on the subject. There is certainly no evidence in the record showing that he had knowledge of any facts which he failed to disclose to the plaintiff from which the earnings of the mill could be estimated with any certainty. The fact that the mill did earn a large dividend was due in a great measure to circumstances which occurred after the purchase of plaintiff's stock, and which the defendant at the time he made such purchase did not know and had no reason to believe, so far as the evidence in the record shows, would occur.

In order to sustain an action based upon false representations the evidence must show that the alleged representations were representations of fact and not merely expressions of opinion; were known to be false by the defendant, or were recklessly made without any regard to their truth or falsity, and made for the purpose of influencing the plaintiff, and that such representations were relied on by the plaintiff. Applying this rule to the undisputed facts in this case, we are of opinion that the plaintiff has failed to show that he is entitled to any relief.

The evidence not only fails to show that defendant knew, at the time he purchased plaintiff's stock what the dividends upon such stock would be, but affirmatively shows that it was impossible at that time to have known what the mill would earn. The earnings of an oil mill are in the nature of things dependent upon many contingencies, and any statement as to what such earnings will be, made before one-half of the season's output of the mill has been disposed of, must necessarily be merely an expression of opinion, and can not be regarded as a representation of facts. Such being our view of the force and effect of the undisputed evidence in this case, it is unnecessary for us to discuss appellant's various assignments of error in detail. It is sufficient to say that in our opinion none of the assignments point out any material error. The undisputed evidence being such that no other verdict than one in favor of plaintiff could properly have been rendered, any error committed by the court below in overruling exceptions to portions of defendant's answer, in his charge to the jury, or in the admission or exclusion of evidence which could not in any way affect the force of the

undisputed facts in the case, was harmless and would not authorize a reversal of the judgment. The judgment of the court below is affirmed.

*Affirmed.*

Writ of error refused.