PEEPLES v. GEORGIA IRON & COAL CO. et al.

In re GEORGIA STEEL CO.

(Circuit Court of Appeals, Fifth Circuit. January 23, 1918. Rehearing Denied April 3, 1918.)

No. 3123.

1. VENDOR AND PURCHASER ☞119—FRAUD—VACATION.
    Where a purchaser of coal lands, an iron furnace, and other property was in possession, and did the development work for five years, making partial payments without objection that it had been induced to purchase through fraud of the seller's representatives, the purchaser cannot thereafter secure a rescission of the contract on the ground of such misrepresentations, for it is essential, not only that there be a misrepresentation, but that action be taken as soon as facts are discovered which give notice of the fraud, and the purchaser's development work must have disclosed the falsity of the misrepresentations asserted.

2. VENDOR AND PURCHASER ☞119—RESCISSION—GROUNDS.
    The payment by a seller of a commission to an agent, or officer of the purchaser, entitles the purchaser to avoid the sale, but he must act promptly after ascertaining the fact, so as to restore the status quo, the payment of such commissions not carrying with it any right of readjustment of price.

3. VENDOR AND PURCHASER ☞44—FRAUD—EVIDENCE.
    In considering a seller's fraudulent misrepresentations, evidence of the payment of corrupt commissions to the buyer's agents and representatives is admissible.

4. BANKRUPTCY ☞467—REVISION—REVIEW—FINDINGS.
    The trustee in bankruptcy of a corporation, which had purchased coal lands, an iron furnace, and other property, attacked the claim of holders of bonds given for the purchase price, asserting that the sale had been induced by fraudulent misrepresentations as to the value and character of

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

the property, that its value was less than a third of the price paid, that the seller paid secret commissions to officers of the bankrupt corporation, and that on account of such misrepresentations and payment of secret commissions the sale was subject to rescission. The bankruptcy court found that the misrepresentations were not of a character to authorize the reduction of the purchase price, and that the giving of commissions was not of a fraudulent character authorizing rescission, the matter being known to the purchasing corporation. *Held,* it appearing that the purchaser made an independent investigation of the property before buying, and that the arrangement for payment of commissions to its officers was made before they became officers, that, in view of the burden of proof on the trustee, the rigid rules as to the establishment of fraud, the lapse of five years before the sale was attacked, and the deference to be paid to the findings of the trial judge, the conclusion of the lower court, which was supported by the evidence, cannot be disturbed.

Appeal from the District Court of the United States for the Northern District of Georgia; William T. Newman, Judge.

In the matter of the bankruptcy of the Georgia Steel Company. On petition of the Georgia Iron & Coal Company and others against O. T. Peeples, as trustee in bankruptcy, to review an order of the referee disallowing petitioner's claims against the estate, the order was reversed, and the claim allowed (240 Fed. 473), and the trustee appeals. Affirmed.

J. B. Sizer and S. M. Chambliss, both of Chattanooga, Tenn., Samuel B. Adams, of Savannah, Ga., and Paul F. Akin, of Cartersville, Ga., for appellant.

Alex C. King, Clifford L. Anderson, and Daniel W. Rountree, all of Atlanta, Ga. (Anderson & Rountree and King & Spaulding, all of Atlanta, Ga., on the brief), for appellees.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

BATTS, Circuit Judge. The Georgia Iron & Coal Company, owning iron and coal lands, an iron furnace, etc., having operated at a loss and become financially embarrassed, offered their properties for sale. Moses Taylor, Van Cortlandt, and others, representing the Southern Steel Company, became interested and employed C. P. Perin, a mining expert, to examine the properties. He sent a man from his office, C. M. Weld, who made a preliminary report, and, after another inspection, a final report. The negotiations did not at that time lead to a sale.

In July or August of the same year, 1906, authority to sell was conferred upon a committee acting for Atlanta banks, who were creditors of the corporation, and T. D. Meador, one of the committee, resumed negotiations with the Southern Steel Company, after having associated with himself C. E. Buck. Mr. Joel Hurt was the principal owner of the stock of the corporation, and, contemporaneously with Meador's efforts to sell the property, he was making like efforts elsewhere, demanding a larger price than Meador was undertaking to sell at, and expressing an intention to repudiate Meador's authority.

Meador and his associates reaching an agreement with Taylor, Hurt was not satisfied, and demanded changes. Meador had been promised

a commission of $60,000; this he had agreed to divide with Buek. Buek had interested Oakley Thorne, president of the Trust Company of America. Hurt objected to the $60,000 commission. It was explained to him that Meador was to receive only a part, and that it could not be reduced to less than $45,000, to which amount he finally agreed. His other demands were met, and another contract was prepared and signed October 10, 1906. On September 6, 1906, a few days before the signing of the first agreement, Buek and Thorne were made directors of the Southern Steel Company. Buek, as vice president of the Southern Steel Company, appeared before the directors of the Georgia Iron & Coal Company, and stated that his company would carry out the contract of October 10th.

Contemporaneously with the purchase by the Southern Steel Company of the property, it organized the Georgia Steel Company; Buek and Thorne becoming directors. The contract was consummated in the name of this corporation. The contract involved the sale of about 52,000 acres of land, one furnace, railroad, etc., for a total purchase price of $1,620,000. Cash to the amount of $120,000 was paid. Bonds in the amount of $1,000,000, secured by a first mortgage on the property, were executed by the company, and its notes for $500,000, secured by a second mortgage, were made to the vendor company. The obligations were guaranteed by the Southern Steel Company.

On the acquisition of the property the Georgia Steel Company began the opening up of new mines, which, with other improvements, involved expenditures of about $600,000. The plants were operated at a loss, and in 1907 default in interest resulted in a suit to foreclose and receivership. Pending suit to foreclose, negotiations were had between the debtor company and Hurt, owning most of the bonds, which resulted in the payment by the Georgia Steel Company of the notes secured by the second mortgage, which, with interest and costs, amounted to about $650,000. After this adjustment the efforts to develop additional mines continued, and expenditures thus made, together with operating losses, amounted to between $300,000 and $400,-000. In 1911 a suit was instituted by the trustee for the bondholders against the Georgia Steel Company, to enjoin action which was being taken by the latter to dismantle one of its plants and to remove the machinery, etc., to a part of its holdings which was in the state of Alabama. When this suit was instituted, the claims which are now made with reference to misrepresentation and payment of secret commissions, were first suggested in the cross-bill filed. After the filing of this cross-bill a substitute trustee filed an independent foreclosure suit in the same court, and a receiver was appointed. Following this creditors began bankruptcy proceedings, and, after a contest, the company was adjudicated a bankrupt, and the proceedings in the state court abandoned. Bondholders filed their claim, and the resulting contest was referred to a master. The bonds were contested upon the following grounds: It was alleged that the sale had been induced by fraudulent misrepresentation with reference to the value and character of the property; that the value of the property, instead of being in excess of $1,500,000, was less than $500,000; that in the sale of the property secret commissions had been given to two of the officers of

the purchasing company; that on account of these fraudulent misrepresentations, and this fraudulent giving of commissions to an officer of the buying company, the sale was subject to be rescinded; and that the claim asserted by the Georgia Iron & Coal Company should be disallowed.

The master, after lengthy hearings, filed a very able report, finding that misrepresentations had been made; that the property, when sold, was not worth more than $500,000; that Buek and Thorne, officers of the purchasing company, had received secret commissions; and held that, considering both misrepresentations and secret commissions, while the sale could not be rescinded, the bankruptcy court would have a right to refuse to approve the claim of the bondholders. This report of the master was contested before the District Judge, and his holding as to the legal effect of the facts found was overruled; the District Judge concluding that the misrepresentations were not of a character to authorize the reduction of the purchase price, and that the giving of commissions, under the circumstances developed, was not of a fraudulent character, authorizing a rescission of the contract. From this ruling of the District Judge the trustee in bankruptcy has appealed.

The misrepresentations alleged are with regard (1) to the character of the iron ore; and (2) with reference to the extent and quality of the coal. The evidence indicated that the value of the ore depended on the persistency and continuity of the leads, and the nonexistence, below the water line, of sulphur in excessive quantities; and it is charged that Weld was led to an incorrect conclusion upon this matter by Singleton. The view that the brown ore was of a carbonate origin, that it was valuable, even below the water line, and that it existed in very great quantities, had been entertained and expressed by disinterested experts, whose reports had been relied upon by all parties. While the facts are not absolutely and definitely determined, even up to this time, the probabilities are that the valuable ore is very limited in quantity. With reference, however, to this feature of the case, there is not sufficient evidence to authorize a court of equity to hold that such misrepresentations were made as would authorize either the rescission of the contract or the readjustment of the price. Its existence, its character, and its extent were essentially matters of opinion and judgment. In the sale of mining properties both parties ordinarily take a chance.

The facts with reference to the coal deposits are somewhat more tangible. Weld's report was based almost exclusively upon the statements of Singleton. It is very apparent that Weld relied, almost entirely, upon information received from Singleton, and that fact was apparent to Singleton. There is no evidence of any direct and absolute misstatement of fact on the part of Singleton. There is, however, ample evidence of a failure on his part to disclose facts that were material, and facts which it is insisted he was under obligations to disclose under the conditions created by the character of investigation made by Weld. It appears that, prior to the examination by Weld, a very large number of holes had been sunk in an effort to ascertain

the location and extent of the coal field. In all the interviews between Singleton and Weld as to the coal, no reference was made to these efforts which had theretofore been made to ascertain whether there was coal in sufficient quantities to operate the property. Weld's conclusion, as stated in his report, was very far from the facts as they have since been developed. It is now assumed that the coal is limited in quantity, and in thin deposits, and inadequate for the successful operation of the properties.

The Georgia Iron & Coal Company insists, primarily, that Singleton was in no way authorized to speak for it, and that any misrepresentation made by him was upon his own account, and was accepted by the purchaser at his own risk. There is some evidence to indicate that the officers of the Georgia Iron & Coal Company depended upon Singleton to do the very things which he did, and subsequently—that is, after the sale had been consummated—a payment was made to Singleton for his services in making the sale. This latter action could have been taken in recognition of what was assumed to be the proper and valuable services on the part of Singleton, and as not in the discharge of a legal obligation to him. It is quite possible that Singleton, in what he conceived to be his duty to his company, directed the attention of the investigator to features favorable to the property, under the assumption that he would make an especial effort to find those which were not, and that there was no obligation on his part to give aid in these efforts.

The company denied any authority of Singleton to make any statement of any kind, and Singleton testifies that he neither made any misstatement nor concealed any pertinent fact. Assuming, however, that Singleton's conduct is chargeable to the company, and that he did fail to make statements as the result of which Weld reached incorrect conclusions, a question arises as to the extent of the duty of the seller, when the buyer undertakes to make his own investigation. It is apparent that the Southern Steel Company would not have accepted, and in fact did not accept, the statements made by representatives of the selling company. They employed a man to make the investigation, and they doubtless acted upon the report which he made, rather than upon any information which they secured from the seller. Singleton's fraud, if his conduct constituted fraud, consisted in abstaining from telling all that he knew about the coal, and in making a statement with reference to the character of the iron ore which no one is in position to say was not honestly made, even if it is now certain that his conclusion was incorrect.

[1] Most trades result from the efforts of each of the parties to benefit himself at the expense of the other. This each party perfectly well understands. The trade is not compulsory. Each party may abstain from making the contract until he is satisfied as to the facts. Something of exaggeration as to the merits of his merchandise is expected of the seller. It is so nearly conventional as to have legal recognition. Equity will relieve against fraud, but the seller's normal lack of conservatism of statement is not so characterized. All this, where the buyer relies upon the seller. Where the buyer elects to assume that the seller will not tell the truth, and relies upon his own in-

vestigation of the facts, there is even less inclination on the part of courts to interfere. If the buyer chooses to substitute his own judgment for the seller's statement, he is permitted this reasonable privilege. A court is not an agency for relieving business men from the effects of their mistakes. The common law is a product of more vigor than refinement. It encourages independence and self-reliance. The development of equity has made modifications in its crude vigor; but equity, as administered in the courts, is the output of the same peoples who made the common law, and its principles have not yet reached the lofty ideals of early Christianity, nor even the refined justice of the civil law. The line between permissible overreaching and punishable fraud is illy defined, and so it has been from the time Jacob demonstrated the profitable potentialities of the science of eugenics at the expense of Laban, even unto this day. Genesis xxx, 31–43.

[2] Under the circumstances developed in this case, the conduct of Singleton in abstaining from telling what had been done with reference to test holes for coal, was, perhaps, entirely effective as a misrepresentation. If an effort had been made to promptly set aside the transaction on account of these misrepresentations, an appeal would have been made to a court of equity which it might have hesitated to ignore. In order, however, to make a proper appeal to a court of equity to rescind a contract or readjust a price, on the ground of misrepresentation, there must not only be a material misrepresentation, intended to mislead and having that effect, but action must be taken as soon as facts are discovered which give notice of the fraud.

The sale was in 1906, and no attack was made, upon this ground, until about five years after. During this period the effort at development was continuous. All the property was in charge of the purchaser, and it can easily be assumed that every part of it was examined, and that there had been ample time and opportunity in which to ascertain the truth or the falsity of any statement which had been made by any of the parties at the time of sale. Even in 1909, when there was a fourth partial payment of the contract price, and an extension of the bonds which had been matured by nonpayment of interest, all the facts, it must be held, were either known or could have been known. The conclusion that must doubtless be reached with reference to this feature of the case is that, at the time of the purchase, the Southern Steel Company was satisfied by the report made by Weld, and believed that the property had a value largely in excess of the price paid. This belief continued, and, even when one failure after another had been experienced, there was a continuation of the hope that the next efforts would be met with success that would realize the original estimate of large profits. The purchaser continued, after he had an opportunity to know as much as any one knew, to take the chance. Who speaks tardily to a court of equity must speak convincingly.

[3, 4] A much more serious question than that presented by the allegation of misrepresentation arises out of the payment of commission to Buek and Thorne. It is a proper rule of law that when a person, by the payment of secret commissions, corrupts the officer or employé of the purchasing person or corporation, the sale may be set aside at

the suit of the latter. The facts developed in this case, however, do not bring it definitely under the terms of the law as it has been developed. Buek was primarily associated with Meador before he had any connection with the Southern Steel Company, and Thorne became interested before he had such connection. It is true that Buek and Thorne became officers of the purchasing company before the consummation of the sale. On the other hand, the negotiations which led to the sale and the execution of the original agreement between the selling and buying parties antedate Buek's official connection with the buying company. This fact was known to all the parties. Just when Buek began to have interest in the purchasing side does not appear, but the purchasers were doubtless charged with notice of the fact that Buek, even after this association began, was expecting a commission from the sellers.

The evidence indicates that when Perin was employed he came to Atlanta and there ascertained that Meador was dividing his commission with Buek. Subsequently, Perin talked to Buek about this, and was assured by Buek that he would not accept a commission, or that, if he did, it would be for the benefit of the buying company. At the time Hurt refused to carry out the original agreement made between Meador and Buek on the one side, and Taylor on the other, Taylor received a letter in which reference was made to the fact that Buek would be consulted with regard to the matter of adjusting the commissions; the letter carrying the necessary inference of some interest by Buek in the commissions. In 1911, when the readjustment of the bonds and interest was effected, another letter passed, which could very well have charged the buyers with notice of the fact that Buek had received a commission. There is nothing to indicate that the selling company at any time undertook to keep the fact of the commission secret; and it is probable that the buying company knew as much about it all the time as at the time when no longer able to carry out their contract, they began to charge that the selling company had corruptly paid the commissions.

The payment by a selling company of a commission to an agent or officer of the purchaser carries with it only one right in equity; that is, to rescind the contract. The buyer has the option to avoid the sale. He must act promptly after ascertaining the fact. So acting, he may, so long as he is in position where he can restore the original status, invoke this remedy. But this right to rescission does not carry with it any right of readjustment of price. The payment of corrupt commissions is a character of fraud that has no relationship to price. No effort has been made in this proceeding to invoke that remedy; and, if such an effort had been made, the lack of ability to restore conditions to the original status would have prevented.

The referee properly considered the evidence with reference to the payment of corrupt commissions in connection with fraudulent misrepresentations as to value. Again, however, the delay must not be ignored. The record in the case is large. While the very able briefs filed for appellants and appellees have greatly reduced the labors of the court, it is not practicable to review the facts or state the conclusions of law more fully. In view of the burden of proof upon appellants, the somewhat rigid rules as to the establishment of fraud, the great lapse

of time since the transaction complained of, and the deference to be paid the findings of the trial judge, the conclusion is reached that the evidence would not justify an appellate court in reversing the judgment rendered.

The judgment is affirmed.