OMAR OIL AND GAS COMPANY, a corporation of the State of Delaware, Defendant Below, Plaintiff in Error, *v.* MACKENZIE OIL COMPANY, a corporation of the State of Delaware, Plaintiff Below, Defendant in Error.

*(November 8, 1926.)*

WOLCOTT, CH., PENNEWILL, C. J., and RICHARDS and ROD-NEY, J. J., sitting.

*Caleb S. Layton* (of Marvel, Layton, Hughes and Morford,) and *Thorp, Bostwick, Stewart* and *Reed* (of the Pittsburgh, Pennsylvania, Bar), for defendant below, plaintiff in error.

*Andrew C. Gray* (of Ward, Gray and Ward), and *Charles P. Northrop* (of the New York Bar), for plaintiff below, defendant in error.

Certain promissory notes were given by Nathan F. Clark to the Mackenzie Oil Company for the purchase price of an oil lease in the state of Texas, known as the Ackers lease. The Omar Oil and Gas Company was the purchaser and guaranteed the notes of Clark. Suit was brought against the Omar Company, in the Superior Court of New Castle County. An affidavit of demand was filed

and judgment was entered in that Court for the plaintiff for want of an affidavit of defense.

An application to open this judgment was made to that court by the Omar Company on the ground that the purchase of the property and the giving of the note sued on was brought about by fraudulent misrepresentations on the part of the Mackenzie Oil Company, or by certain of its agents.

By agreement of counsel, the judgment was opened and the case heard before a referee who, also, found that judgment should be entered for the Mackenzie Oil Company.

CASE HEARD IN THE SUPERIOR COURT ON EXCEPTIONS FILED TO THE REPORT OF SUCH REFEREE. The report of the referee was, however, confirmed by that court and a writ of error was taken to this court.

Most of the essential facts and contentions of the parties sufficiently appear in the opinion of the court. The report of the referee filed in the court below was, in part, as follows:

"Under the stipulation of counsel, it was provided 'That the findings of fact by said Referee shall be final and binding upon all parties hereto'. The findings of law, however, to be reviewed by the Superior Court as therein provided, each party reserving the right to a writ of error to the Supreme Court. * * *

On or about the 21st day of December, 1920, the plaintiff, through David Mackenzie, its President, entered into a written contract with N. F. Clark, the then President of the defendant. This contract, provided, among other things, that the plaintiff should sell, and the defendant should buy the Ackers lease, together with all personal property on the premises used in the development and operation thereof (with certain exceptions) for the sum of $400,000.00, to be paid by the delivery to the plaintiff of one-half of the oil produced on the lease, after deducting the royalty of one-eighth to the land owner, until the value of the oil so delivered should aggregate the sum of $200,000.00; the price of the oil thus delivered to be the price received from the pipeline company to which it was delivered, other than certain pipeline companies therein named. The remaining $200,000 of the pur-

chase price was to be paid as follows: $50,000.00 in cash on execution of the contract, and Clark to execute four notes, dated December 21st, 1920, to the order of the Mackenzie Oil Company, due respectively, in four, six, nine and twelve months from date, note No. 1 for $25,000.00, notes Nos. 2 and 3 for $50,000.00 each and note No. 4 for $25,000.00. Said notes to be secured by the guaranty of payment on behalf of the T and B Pipeline Company and the defendant and certain preferred stock of the T & B Pipeline Company pledged as collateral, both of said companies being represented by Clark as having a substantial interest in the contract. * * * * *

The contract further contained the following provision:

'The property hereby agreed to be sold has been examined and inspected by the vendee, through its agent, and same is hereby accepted in its present physical state without any representations or warranties on the part of the said vendor, other than to its title thereto, and that well No. 1 has not been shot'.

This contract was prepared or approved by counsel for the Mackenzie Oil Company and Clark and no satisfactory evidence is introduced by either party to show that it did not correctly state the understanding and agreement of the parties thereto.

Mr. Clark paid, or instructed to be paid, the cash payment of $50,000.00 and made and delivered the four notes therein provided for * * *.
* * * * *

At or about the time of its maturity, note No. 1 was paid in full and no claim is made thereon. No claim has been made and no evidence introduced to show that the Mackenzie Oil Company did not perform the obligations imposed upon it by the terms of the contract and there is likewise no evidence or claim made by the plaintiff that it ever exercised the option to mature and make payable at once notes Nos. 3 and 4 by reason of the failure to pay the principal or interest on any of the notes, or the failure of Clark to perform any agreement contained in the contract of sale.

On or about November 24, 1921, $25,000.00 was paid on account of Note No. 2, but no interest was paid on this or notes Nos. 3 and 4, the claim of the plaintiff being for the principal sum

of $100,000.00 represented by $25,000.00 balance due on note No. 2, $50,000.00, the principal amount of Note No. 3 and $25,000.00, the principal amount of note No. 4. * * *

The plaintiff has introduced in evidence, an extension agreement dated December 12, 1921, executed by the defendant, Omar Oil & Gas Co., the plaintiff, Mackenzie Oil Company, and one Charles M. Thorp, Trustee. This agreement starts with the following recital:

'WHEREAS, the Omar Company is indebted to the Mackenzie Company in the principal sum of $100,000., which indebtedness is now secured by certain collateral'

It then recites that the Mackenzie Company has requested the Omar Company to furnish certain additional collateral, which was done * * * .

* * * In consideration of the foregoing agreements, the Mackenzie Company extended the time of the payment of the Clark notes so that the balance due on note No. 2 should be due on March 1, 1922, the amount due on note No. 3 should be due June 1, 1922 and the amount due on Note No. 4 should be due September 1, 1922. The agreement further recites that it was made in pursuance and execution of a resolution of the Board of Directors of the Omar Company, duly passed at a meeting duly called. This agreement was signed by Clark on behalf of the Omar Oil and Gas Company and Mackenzie on the part of the Mackenzie Oil Company.

It is to be noted that this agreement also was submitted to counsel for both plaintiff and defendant and there is no testimony before me which shows, or tends to show, that this agreement did not correctly state the purpose and intention of the parties to it.

The defendant admits the execution and delivery by it of each of the two agreements hereinbefore referred to, the making and delivery of the cash payments, the making and delivery of the four promissory notes and that in pursuance of the said contract of December 21st, 1920, it took possession of and conducted the operations upon the Ackers lease * * * .

The defendant expressly disclaims any purpose or intention of rescinding the contract, but on the contrary thereof (1) seeks to reduce the claim of the Mackenzie Oil Company on the theory that it has been defrauded in the transaction; and (2) claims to have overpaid the Mackenzie Company and seeks to have awarded to it in this action a balance claimed to be due from the Mackenzie Oil Company to it by reason of such overpayment and the loss which it has sustained by reason of the fraud relied upon.

Briefly stated, the contention of the defendant is that it was induced by the plaintiff to purchase the Ackers lease and enter into the contract of December 21st, 1920, by reason of the fraudulent representations and conduct of the plaintiff. It is claimed that the fraud practiced by the plaintiff upon the defendant consisted:

1. On the payment to Thompson and Bryson of a part of the commission paid by the Mackenzie Oil Company to the agents or brokers making the sale of the Ackers lease;

2. Misrepresentations by the plaintiff as to the production of the oil of well No. 1 prior to December 21st, 1920;

3. Misrepresentations by the plaintiff as to the amount of water which well No. 1 was making prior to December 21st, 1920;

4. Misrepresentation by the plaintiff as to the condition of well No. 2 on and prior to December 21st, 1920;

5. That a part of the personal property sold to the defendant under the contract was not in first-class condition, as represented by the plaintiff.

It is further contended by the defendant that at the time of the execution of the agreement, December 12, 1921, it was not in possession of knowledge as to the alleged fraudulent conduct and representations of the plaintiff.

Early in the hearings before the Referee, I stated that in my opinion (and to this no exception has been taken by either party) the relations of the parties are to be deemed by the law of the State of Texas where the transactions took place, the contract of sale was made and to be performed, and the notes were made and payable, and counsel for both parties have referred me to numerous Texas cases, all of which I have carefully examined. Counsel for

the plaintiff have introduced certain extracts from the statute law of that State in force at the time the contract of December 21st, 1920, was made, and which have continued in force since that time.

With the exception of the statutory provisions above referred to, I have been unable to find any decisions of the Texas Courts which are not in harmony with the general rules of law prevailing in Delaware and elsewhere.

*Article* 4979 (3103) of the Texas Code provides:

'The parties to any written contract may agree to and stipulate for any rate of interest not exceeding ten per cent. per annum on the amount of the contract'.

In Texas, as in Delaware, certain propositions of law applicable to the facts of this case are well settled. It, of course, makes no difference, where it is claimed that a transaction was induced by fraud, whether one seeks to rescind the contract on this ground, or use the claim of fraud as a defense or an affirmative cause of action, the rights of the parties and the rules of law are the same in either case. * * *

Fraud, in a case of this kind, in order to constitute a defense, or be the basis of an affirmative cause of action must involve the following requirements:

1.   A false representation of material facts.

2.   Knowledge of the falsity of the representations by the person making them, or a disregard of his means of knowledge;

3.   Ignorance of the falsity on the part of the person to whom the representations were made;

4.   Intent that the representations shall be acted upon by the person to whom they were made; and

5.   Action by the person to whom the representations were made to his damage.

2 *Williston on Sales*, *Sec.* 624; 1st *Elliott on Contract*, *Sec.* 81.

Each of the foregoing essential elements is of course subject to qualification in view of the particular circumstances of the case, and the Referee does not presume to do what Courts have de-

clined to do, namely, attempt to state all of the elements essential to legal fraud, or the qualifications thereto.

This is a proposition of law which seems to be almost universally adopted. Perhaps nowhere is this principle more concisely and clearly stated than by Chief Justice Fuller in *Farrar v. Churchhill*, 135 *U. S.* 609. * * *

The Court of Appeals of Texas has frequently affirmed the proposition as there stated.

*Downes v. Suf.*, 28 *Tex. Civ. App.* 356; *Wortman v. Young*, 235 *S. W.* 559; *Newman v. Lyman*, 165 *S. W.* 136; *Hawkins v. Wells*, 43 *S. W.* 816; *Nowland v. Young*, 220 *S. W.* 154; *Foster v. Bennett*, 178 *S. W.* 1001.

In view of the foregoing principles of law, a brief comment will be made upon the facts as they appear from the record. But before doing so, I cannot avoid commenting upon the following facts * * * .

The parties to this transaction both knew that they were dealing with a condition which was surrounded by the highest degree of uncertainty. They both knew that in this particular field what a producing oil well had done in the past had no particular bearing upon what it was doing now or might do in the future, except as it might be possible for them to draw analogies from what had happened and was happening in the same field under similar conditions. It clearly appears from the testimony in this case that in this particular field, what a producing well, wherever located in relation to the apex, would produce had little, if any, relation to what it had produced at the time of its flush production. All that was certain was that the production in the field was rapidly falling in December, 1920.

The parties both knew that in December, 1920, the price of oil in this field was $3.50 per barrel and neither of them could know whatever might be his opinion on the subject, that this price would fall to much less than that amount during the early months of the year 1921. What they both did know was that the purchase of property in this field was attended with great uncer-

tainty as to its ultimate value from the standpoint of the purchaser. Under such circumstances, men are necessarily influenced by considerations which are almost, and sometimes altogether, lacking in other branches of business enterprise. The element of chance was here present to a degree almost unique, except in mining operations.   *   *   *

The defendant has not seen fit to introduce any evidence as to the production of well No. 1, either in oil or water, after December 21st, 1920, and during the time when it had possession of the property and knew exactly what the well was doing. While it is of course true that the conditions as they existed on December 21st, are the important ones so far as the record is concerned, Well No. 1, might, after December 21st, and after it had been shot, have produced more or less oil or water; and particularly in view of the testimony of Wilson W. MacDonald, a witness produced by the defendant and one who impressed the Referee as being particularly honest and competent to speak, that the shooting of a well doubles the quantity of water as compared with the quantity of oil. Evidence upon this point might have been of considerable importance. However this may be, the defendant in this case, after it took possession of the Ackers lease knew exactly what well No. 1 was doing and what, if any, efforts had been made by it to remedy the conditions existing in well No. 2.   *   *   *

(The Referee here stated, in substance, that oil had been discovered in the Breckenridge field, Stephens County, Texas, in the Spring of 1920 and that a boom period prevailed in that field until the latter part of that year; that because of the boom, there was great fluctuation in the prices paid for oil properties, but that in December of 1920, the flush production, both in oil and gas, had rapidly fallen and the gas pressure was going off rapidly. MacDonald, who testified for the defendant, stated that the oil formation in the Breckenridge field was a lime formation and the fact that one well produced a large or small quantity of oil was not necessarily any guide as to the production of another well on the same or an adjoining property).

The foregoing in a general way were the conditions which

confronted Clark, and as they were a matter of common knowledge, must have been known and appreciated by him on December 21st, 1920.

It further clearly appears from the testimony that none of the parties interested in this transaction were what might be called "tenderfeet." Mackenzie, Clark and Besse had each many years' experience in the oil business, the development and acquisition of oil properties, and as before pointed out, the plaintiff and defendant in this action were advised by counsel, engaged by them respectively, in every important step and stage of the transaction.

Throughout the hearings before the Referee, the greatest latitude was permitted in the examination of Thompson and Bryson, and in relation to their connection with the matter, by whom the defendant claimed it had been deceived, and who it likewise claimed had proved false to their duties as defendant's or Clark's agents, and who had received a part of the commission paid by the plaintiff for the sale of the Ackers lease. One of these witnesses, Thompson, was produced by the defendant, and the other, Bryson, by the plaintiff. In view of the conclusion I have reached, it is not necessary for me to determine the disputed questions of fact relative to the actions of these two men in this transaction. They may or may not have been under the facts the agents, so far as this transaction went, of Clark. Both of them were directors of the T & B Pipe Line Company, and Thompson a director of the defendant corporation. When they sold their stock in the T &. B Pipe Line Company to Clark, or the Omar Company, they may or they may not have had an understanding and agreement that they might still continue to charge commissions on properties sold to, or brought to the attention of Clark, the Omar, or the T & B Pipe Line Company through their efforts. They may, or may not, as stated by Bryson, have early in the year 1923, informed Clark that one or both of them had participated in the commission paid for the sale of the Ackers lease. These matters, about which the testimony is conflicting, might have had great importance had the defendant in this case taken the position of rescinding the transaction.

This is clearly and frankly stated on pages 55 and 56 of the defendant's brief. See *Peoples v. Georgia Iron & Coal Co.*, 248 *Fed.* 886, cited by defendant.

Bryson, however, testifies, and his statement is confirmed by the testimony of other witnesses, that on one or more occasions on or prior to December 21, 1920, he went upon the Ackers lease with a view of satisfying himself as to the conditions there existing, and there made such unhampered investigation as he cared to make. Notwithstanding the fact, if it be a fact, that Bryson was an "unfaithful" agent (if he was Clark's agent), he, Clark, and the defendant are charged with such knowledge in relation to this property as Bryson had. *Curtis Co. v. U. S.*, 262 *U. S.* 215.[1]

It clearly appears from the testimony that for sometime prior to December 21st, 1920, Clark had in mind the possibility of his desiring to acquire the Ackers lease. He received one or more reports in relation to the property prior to his making a personal trip to Texas. He made this trip, so far as this case is concerned, for the purpose of ascertaining for himself whether he desired on behalf of himself or the Omar Company to acquire the Ackerslease. Upon his arrival, he had two or more interviews with Mackenzie, President of the Mackenzie Oil Company. He discussed conditions in the Breckenridge field with others, and apparently unsatisfied with his knowledge of the conditions, or the information which had been given to him by Mackenzie, or others, he caused his representative, Besse, to examine the property. Besse, so far as this record discloses, is not touched with any charge of misfeasance or nonfeasance. He is not only a witness, produced by and examined on the part of the defendant, with the usual re-

---

[1] It was strenuously contended both in the court below and in the Supreme Court that this statement of the referee was erroneous and that the case cited by him was not an authority for it. See *Mechem on Agency, Secs.* 1815, 1826; *2 C. J., "Agency," Sec.* 350; *21 R. C. L. "Principal and Agent," Sec.* 24; *Centennial Mutual Life Asso. v. Parker,* 16 *S. W. (Tex.)* 316; *Cooper x. Ford,* 69 *S.W. (Tex.)* 487; *To Bril v. Cartwright,* 118 *S. W. (Tex.)* 785; *Waite v. Santa Cruz,* 89 *F. R.* 619; *Ins. Co. v. Muich,* 53 *N. Y.* 144; *Gunster v. Scranton, &c.,* 181 *Pa.* 327; *Wells v. Smith,* (1914) 3 *K. B.* 722, 6 *K. B. R. C.* 947; *Barnsdale v. O'Day,* 134 *F. R.* 628.

sult of such production and examination, but it is nowhere charged that any corruption, ignorance or imposition of any character existed, or was present in the performance of his duties to his principal. What Besse knew about the conditions on his first and second trips to the Ackers lease, Clark knew; such examination as Besse made, Clark made; and Besse's failure to perform any act in connection with this transaction was Clark's failure to perform it. Clark, through Besse, acted or failed to act.

The Referee believes the testimony of this witness to be of the utmost importance in the decision of this case and without attempting to use the witness's own language or to use language as strong as that used by the witness, the following uncontraverted facts appear therefrom.

He went upon the property with one object in view, and that was as Clark's representative to make an examination of the conditions existing on the Ackers lease. He was afforded every opportunity to make such examination. Possibly the one thing which was not capable of actual demonstration by Besse was the then condition of well No. 2, and as to this he testifies that he examined this well, and was informed that the casing in the well had collapsed; that a swedge had been used, and that the swedge was then in the well detached from the apparatus necessary to withdraw it, and it of course was self-evident that in order to make this well of any value, the swedge would have to be removed. Besse knew that the "fishing job" referred to in the testimony contemplated the removal of a swedge located in well No. 2.

Referring to this well, Besse states that he made an examination on his first visit to the lease, and in answer to the question "You knew the condition of No. 2 while you were there on the sixteenth" he said "I expect I knew it as well as anybody could know it." He states that he found out exactly what the condition of Well No. 2 was at that time, and that when he subsequently took charge of the property, he found it was in practically the same condition as it was on the occasion of his first visit.

Whatever uncertainty there may have been in the mind of

Clark as to the condition of well No. 2, entirely irrespective of Besse's examination and knowledge, and such other information as came to Clark on the subject, it is impossible to reach the conclusion that, in view of the particular care employed in relation to well No. 2 in the preparation of the contract of December 21st, 1920, all that the parties had in mind was "a slight fishing job."

So far as the production of well No. 1, both in oil and water, was concerned, Besse could have known to the point of absolute certainty what well No. 1 was doing. Demonstration upon this point was available to him. No one interfered with his using his eyes and other senses in connection with his long experience in determining, with such accuracy as he desired, the production in both water and in oil of well No. 1. The same is true in relation to the possibly more simple and less technical examination of the personal property, machinery, etc., embraced within the provisions of the contract, and on behalf of Clark, and without any question as to his authority so to do, Besse approved the "inventory of material and equipment transferred to N. F. Clark, Ackers Farm, Breckenridge, Texas."

There is no dispute in the testimony as to the foregoing authority and actions of Besse as the representative of Clark. Possibly, although this I am not called upon to decide, if Clark had been satisfied with the representations made to him by Mackenzie and others and had not seen fit to conduct an independent examination of his own by his selected and skilled agent, there might have been some ground in law and fact for the contention made by the defendant. But Clark's election to make this examination for himself clearly brings the case within the rule universally approved by the Courts of Texas and elsewhere above referred to.

As before pointed out, the important and material fact was what well No. 1 was doing on or about December 21st, 1920. What it had been doing was of much less importance, in view of the conditions existing in the Breckenridge field, and what the future held in store was the chance the purchaser assumed.

In this connection, the language employed in the contract of December 21st, 1920, has, in my opinion, particular weight. By the advice of counsel—and it must be presumed with the full knowledge of both parties as to what they were doing—there was inserted in that contract the following:

'The property hereby agreed to be sold has been examined and inspected by the vendee through his agents, and same is hereby accepted in its present physical state without any representations or warranties on the part of the said vendor, other than to its title thereto, and that well No. 1 has not been shot.'

I heartily approve of the salutary and wise rule laid down in such cases as *Pearson v. Dublin* (1907), *A. C.* 351, *J. I. Case &c. Co. v. Webb*, 181 *S. W.* 853, and in the text books cited by the learned counsel for the defendant, but so far as I can see, neither the cases, nor the principle there enunciated have any bearing upon this question. I know of no principle of law, or good reason which prevents a party to a contract of sale in the first place making, without any interference or fraud practiced upon him, an examination, complete as he may desire, of property to be purchased by him, and then inserting in his contract of purchase a provision such as that here involved. Nor do I know of any principle of law, or good reason which will prevent a vendor from saying to the vendee 'You are entitled to make such examination of my property as you see fit to make, and if you make such examination, so far as I am concerned, you may accept or reject the property in its present physical state, and I am not to be held after such examination to any prior representations or warranties which I may have made or you may understand that I have made.' Were this not the case, the principle of law established as before quoted would be utterly meaningless and without any value, force or effect.

The production of oil from well No. 1, the amount of water which it was making, the condition of the personal property, etc., were, as before stated, matters easily ascertainable by examination and inspection.

I have endeavored in the foregoing to state my views and

findings in relation to the contentions made by the defendant growing out of what preceded the making of the original contract of sale. Had I any doubt on this subject, however, such doubt would be entirely removed by the subsequent conduct of the parties. The record is clear that after the failure of Clark to pay the principal and interest of note No. 2 at its maturity, much correspondence and a number of personal interviews followed, in which Clark unequivocally promised to pay the balance due on the purchase price of the Ackers lease, and this after he and the defendant company had been in possession of this property for many months, and likewise for many months had failed to comply with the provisions of his contract relative to the further development of the Ackers lease. I cannot disregard the testimony of Bryson, Barwise and Odell, to say nothing of Mackenzie, that prior to December 12th, 1921, Clark was possessed of all the knowledge that he now has in relation to all the elements of fraud claimed by the defendant to have existed at the time of the making of the contract of December 21st, 1920. Having all of this knowledge, and with a view of benefitting himself and the defendant company (because it is clear that the plaintiff wanted its money and not further security for the money), the defendant company, through Clark, and with the advice of counsel, and under no misapprehensions as to its meaning, and after action taken by the Board of Directors of the defendant, deliberately and under seal stated in the contract of December 12th, 1921, that 'the Omar Company is indebted to the Mackenzie Company in the principal sum of $100,000.00' and by pledging additional collateral for the payment of this sum, secured an extension in the time of payment of the notes given in connection with the acquisition of the Ackers lease. I must confess that the most unsatisfactory testimony given before the Referee is that of Clark in connection with the execution of this supplemental agreement.

It is not necessary to resort to any questions of estoppel, laches or ratification so ably handled and presented by counsel on both sides. It is difficult indeed to imagine a case where, under all of

the facts, the salutary rules of law, which prevent a party to a transaction from either repudiating it, or making a defense against the obligations thereby created by the course of conduct which he has seen fit to follow, can have a more direct and persuasive application.

As before pointed out, each of the notes given by Clark contains the following provisions:

1. 'After maturity, the note is to bear interest "at ten percentum per annum, both principal and interest." '

2. 'And it is hereby specially agreed that if this note is placed in the hands of an attorney for collection, or if collected by suit or through the bankruptcy or Probate Court, I agree to pay ten percent. additional on the principal and interest then owing hereon as attorney's fees.'

It seems quite clear that, under the law of Texas, interest may be charged upon the principal and interest due at the time of the maturity of the note. *Yawes v. Jones*, 19 *S. W.* 443.

The provision in relation to attorney's fees has given the Referee more trouble. My examination of the Texas cases, which have been kindly furnished by counsel on both sides, leads me to believe that there has been very considerable uncertainty as to what the law of that State has been on that subject. * * *

See *Young v. St. Bank of Marshall*, 117 *S. W.* 476. *First Natl. Bk of Eagle Lake v. Robinson*, 135 *S. W.* 372; *Lanier v. Jones*, 136 *S. W.* 255.

There is no testimony in this case, on either side, directly or indirectly touching the question of the value of the services performed by plaintiff's counsel, or any contract between plaintiff and his counsel as to the amount of their fees, and while, of course, the Referee knows that plaintiff's counsel have performed laborious, efficient and long-extended services in the preparation and trial of this case, there is nothing before the Referee which would enable him to pass upon the question of whether ten percent. of the amount of the recovery would, under the circumstances, be reasonable.

Fortunately, however, I believe this question is free from difficulty. It seems to be settled by the adjudicated cases that con-

tracts for the payment of attorney's fees are to be determined by the *lex fori*, since it applies to the remedy only.

2 *Wharton Conflict of Laws*, § 427, and cases cited; 1 *Daniel on Negotiable Instruments*, § 882, *et seq.*

I am more than confirmed in this view of the law by the opinion of Judge Morris in *Liberty Central Trust Co. v. Gilliland Oil Co.*, 289 *Fed.* 75, where this learned Judge held that, notwithstanding the rule prevailing in Texas, where the notes involved in that case were made and payable, it was still open to him to inquire into the extent and reasonableness of the provision relating to attorney's fees. Among the cases cited by Judge Morris with approval is *Merchants-American National Bank v. Coleman*, 204 *Fed.* 24, in which it was directly held that the effect of such a provision in a note is a matter of general and commercial law with reference to which the Federal Courts are not bound by State decisions, but are entitled to form an independent judgment.

If, therefore, the Superior Court of the State of Delaware, being the forum resorted to by the plaintiff, has its own rule upon the subject of the amount which it is permissible to charge as attorney's fees under such a contract as this, the Referee is bound thereby. See *Article* 4202 of the *Rev. Code* of 1915. The Referee will, therefore, fix the counsel fees on the basis of five percentum, of the principal and interest herein found to be due from the defendant to the plaintiff. * * * *

* * * * *

I, therefore, do find and award that the defendant, Omar Oil and Gas Company, is indebted to the plaintiff, Mackenzie Oil Company, as follows:"

(Then follows the various amounts in which the defendant was held to be indebted to the plaintiff for principal, interest, costs and expenses.

There was, however, no controversy in the Supreme Court respecting the rate of interest or counsel fees.)

PENNEWILL, C. J., delivering the opinion of the Supreme Court:

This case is before the Court on writ of error to the Superior

Court of New Castle County, which affirmed an award in favor of the plaintiff below made by a Referee appointed by the parties to hear and determine all the issues of fact and law. It was provided in the stipulation of reference that the findings of fact by the Referee should be final and binding upon all the parties. The award of the Referee was subject to review in the Superior Court and in this Court on questions of law only. The material facts in the case, as well as the contentions of the parties, were fully and clearly stated by the Referee in his report, and they will not be repeated here further than is necessary to make clear the Court's opinion.

The defendant claimed that the essential facts and questions of law in the case had not received consideration by the Referee or the Superior Court; that the Referee failed to find any of the essential facts in issue as he was required to do by the stipulations, but based his award upon conclusions of law which are wholly erroneous; that the Superior Court not only failed to give any attention to the questions of law presented to it by the defendant below, but instead attempted to interpret the opinion of the Referee so as to make it appear that the Referee found the facts against the defendant below, when in truth the Referee made no findings of fact.

The plaintiff below had brought suit in the Superior Court on certain notes which were guaranteed by the defendant, and which were provided for in the contract in question. The judgment in said Court was obtained on an affidavit of demand. A motion was made to open the judgment, whereupon a reference was agreed upon.

The defense before the Referee was that the defendant was induced to execute the contract by reason of the fraudulent misrepresentations of the plaintiff and its agents in material respects, and that the contract and notes sued on were, therefore, void and unenforceable. The defendant claimed, and it was not disputed, that upon discovery of the fraud and misrepresentations it had the choice of three remedies, viz.: (1) To rescind the contract; (2) immediately to sue for damages; (3) to wait until plaintiff sued

and in such proceeding defend against the enforcement of the enforcement of the contract, and counterclaim for damages.

The third remedy was chosen because, as claimed by the defendant, "the fraud was not discovered until about the time suit was brought."

There were many assignments of error filed, but they are all covered by the following points or questions: (1) The correctness of the Referee's conclusion that defendant relied upon its own investigation of the property. (2) The conclusion of the Referee that the defendant waived its cause of action for fraud, if there had been any, by entering into the extension agreement of December 12, 1921. (3) The validity of the award of the Referee finding in favor of the plaintiff, and awarding a new judgment in excess of the judgment previously entered. Upon these points the case was argued by counsel and will be considered by the Court.

The important and crucial question of fact before the Referee, before the Superior Court, and now before this Court, was whether the defendant was induced to execute the contract of sale by any false and fraudulent representations of the plaintiff respecting the condition of the oil lease or property purchased.

The defendant contended that the Referee did not determine this question of fact one way or the other. The plaintiff admitted it was not specifically determined as a question of fact, but contended that it was determined as a conclusion of law. The Referee found that the defendant, through its own agents, made an independent examination of the property before signing the contract, which examination was free and unhampered, and it was, therefore, immaterial whether false representations were made or not, because the law presumes that when a vendee makes such an investigation on his own account, no matter how cursory and incomplete it may have been, he relied on his own investigation and not at all on the representations of the vendor.

The Superior Court held that, while the Referee did not determine specifically the question of fraud relied on by the defendant, he did so in effect. Evidently the Court believed the question

was controlling, and its ascertainment essential to a proper decision of the case. The Court said:

"Whether misstatements were made before or after the examination and prior to the execution of the contract, the controlling question of fact would be whether it appeared from all the evidence that the purchaser was influenced in making the contract by the alleged misrepresentations, or whether the purchaser relied solely on its own examination. As we have already stated, we believe the Referee, in effect, determined that the defendant relied upon its own examination, and was not influenced by any alleged fraudulent statements of the plaintiff."

The Court further said:

"As the Referee did not make any specific finding of fact upon the question, we think it not unreasonable to assume that the Referee was not convinced by the evidence that any fraudulent representations were made which influenced the defendant in making the purchase. As we view the report of the Referee, it is to the effect that the fraud alleged was not made out in fact, and that it appeared from all the evidence that the defendant did not rely upon any alleged misstatements made to it by the plaintiff, but examined and judged for itself."

It is apparent however, from the Referee's report that he did not find from the evidence whether the defendant was or was not influenced by false representations made by the plaintiff. There can be no doubt that under his appointment and the stipulations of the parties, it was the duty of the Referee to find all the material and essential facts in issue, and make the findings a part of his award or report. It may be said that this was his primary and peculiar duty, first, because the reference was made to determine the facts without the expense and delay of a jury trial, and, second, because conclusions are of no value unless based on ascertained and reported facts.

It is the duty of the reviewing Court to decide whether the Referee found the facts in issue, whether his findings were reasonably supported by the evidence, and whether the conclusions of law of the Referee and lower Court were correct. Under the stipulations of the parties, the Referee's finding of relevant fact must be treated as final and controlling if there was evidence to support it. If, therefore, the Referee had found from the evidence, as one of the facts in the case, that there were no false and fradulent representations made by the plaintiff respecting the property,

which induced the defendant to execute the contract of sale, there would be nothing for the Court to review, and the defense based on such representation would be unavailing. It is the law of Texas, where the contract in question was made, as it is of this and other states, that false representations which will avoid a contract must have induced the making of the contract.

We do not mean that any material fact found by the Referee is binding on the reviewing Court, because it is possible that it may not be based on the testimony. It must be not only based on the testimony, but the testimony must be such as to reasonably warrant the finding, analogous to the verdict of a jury which is sought to be set aside because not supported by the evidence.

Did the Referee find the one fact most essential to a decision of the case against the defendant, viz.: That the defendant was not induced to execute the contract because of false and fraudulent representations made by the plaintiff? Certainly he did not specifically and affirmatively find such fact. This is admitted. Does such fact appear as a conclusion of law from other facts the Referee did find? That is the important and most difficult question that this Court has to determine.

Before discussing this particular question, there are others of less importance and difficulty which will be briefly noticed because they were argued at some length by counsel. It was intimated by the Court below, and stressed by counsel for the plaintiff in the argument here, that the failure of the Referee to find that the agreement of sale was induced or influenced by false representations was equivalent to finding that the contract was not so induced. It is insisted that a Referee is not required to make negative findings of fact, and should not do so, because all material facts not affirmatively found by him are deemed in law to be negatived. Some authorities are cited for the proposition that "facts not found are necessarily negatived by implication." There are many authorities, however, to the contrary. Such a rule may be applicable to some cases, but not to the one before the Court, where the one crucial and controlling fact to be determined is essential to a legal decision of the case.

It may be conceded that an argument can be made in support of the plaintiff's contention that the Referee did not believe there was any fraud that induced the contract, because he was convinced that defendant relied on his own knowledge. Manifestly, the Court below was impressed with that thought; but the finding of the vital fact in the case must be more than argumentative or inferential. To obviate the effect of a representation it must be clearly shown, either as a fact or as a presumption of law, that the vendee did not rely on it.

It was contended by the defendant that two of its agents, who were active in effecting a sale of the property, agreed to accept one-half of the commissions the broker would receive in case of a sale to the defendant; that they were, therefore, unfaithful agents, and their knowledge of facts respecting the property sold, could not be imputed to the defendant. It is unnecessary for the Court to express an opinion on this question, for the reason that it is immaterial to a decision of the case whether such agents were unfaithful or not, and if unfaithful, whether their knowledge could be imputed to their principal. Clark, the president of the defendant company, made no examination personally or directly, but did, through his agent, Besse, make some examination of the property before signing the contract. It was upon the examination made by Besse, whose faithfulness was not questioned, and not the knowledge possessed by the alleged unfaithful agents, that was considered by the Referee.

There were cases cited by the plaintiff which seem to hold that if the buyer has an opportunity to verify the representations made by the seller, and nothing is done to prevent him from obtaining all the information that a thorough investigation would disclose, he is precluded from saying that he relied on the representation. We are convinced that such is not the law, and that the great preponderance of authority in Texas and elsewhere is to the contrary. *Buchanan v. Burnett*, 102 *Tex.* 495, 119 *S. W.* 1141, 132 *Am. St. Rep.* 900. Mr. Pomeroy who has considered the question of false representations to a greater extent than any other text-

writer, says, in his work on Equity Jurisprudence, at *Section* 895, *vol.* 2:

"The mere opportunity or means of investigation are not enough.   *   * *   It must be shown that the party proceeded in some measure to avail himself of the opportunity."

We come now to a consideration of the vital question: Did the brief examination the defendant made through its agent, Besse, preclude it from relying on the representation of the plaintiff? The property purchased was an oil property called "Ackers Lease" and consisted almost entirely of two wells, Nos. 1 and 2. Well No. 1 was a producing well, and No. 2 was not producing; it was called a "fishing job." The alleged misrepresentation was made with respect to Well No. 1, the defendant testifying that just before signing the contract he endeavored to learn from the plaintiff personally how many barrels of oil and water said well was producing daily, and that the plaintiff represented the production to be "around three hundred barrels of oil, and a little water"; and that Well No. 2 was a "slight fishing job." The defendant testified that this representation was after the investigation made by Besse, and shortly before the contract was signed; that he relied on the representation, continued negotiations based on the plaintiff's statements made to him on that occasion, and did not know they were false until two years later, about the time suit was brought.

Besse testified that he was sent by Clark, president of defendant company, to examine the property, and that he had had twenty years' experience in the business; that he went on the lease and was invited to make himself at home and go where he pleased; that he asked for pipe line runs for Well No. 1, and did not get them just at that time but did eventually; that he asked for gaugers' reports and records on Well No. 1; that pipe line runs alone are no indication of the production of an oil well, he would rather see the daily gauges; that the pipe line statement is no evidence of what the well would produce, but the daily gauge and the monthly stock report is the information; that he had access to these records the first time he visited the lease and went over them

carefully; that there was nothing on the property he did not see and examine, or was denied access to; he thinks he saw it all, and talked with the employees on the lease pretty well about everything; he thought he knew as much about Well No. 2 as any one could know.

The Referee says that so far as the production of Well No. 1, both of oil and water, was concerned, Besse could have known to the point of absolute certainty what it was doing; that demonstration on this point was available to him; that no one interfered with his using his eyes and other senses, in connection with his long experience, in determining with such accuracy as he desired the production in oil and water of Well No. 1; that they were matters easily ascertainable by examination and inspection.

This was the information the defendant sought to ascertain from the plaintiff after Besse's examination, and it was his answer that constituted the alleged false representation.

■ Under the law, all the information obtained by Besse in his examination must be imputed to his principal, the defendant.

The strict rule relied on by the plaintiff is based very largely on the leading English case of *Atwood v. Small*, 6 *Clark & F*. 232. This is a House of Lords' case, and is entitled to much weight because of that fact. It was said in that case:

"The mere fact that the vendees could have visited the works, and by a personal examination have ascertained all the facts for themselves, would not lessen the effect of this representation. Even had the vendors invited the vendees to come, given them an express opportunity to investigate, directed their attention to this means of verification, this would not have altered the results. The vendees would have had a right to say, 'No; you have made a statement concerning an existing condition of fact which is all within your own knowledge; true, we can come and verify this statement for ourselves, but we are willing to rely on your representation and complete the purchase.' Had they done so, they would have been justified in so doing, and could have rescinded the contract, but they did not do so. They acted on the opportunity; they availed themselves of the means; they took some steps in making an investigation, and thus some information as to the true condition of affairs was communicated to their minds. That the investigation was not thorough, and the knowledge perfect, was their own fault; whatever it was, they relied on it, and not on the representation of the vendors."

Mr. Pomeroy states (*Section* 895, *vol.* 2, *note* [d]) that this rule has been modified in more recent English cases, saying in said note:

"The important case of *Redgrave v. Hurd, L. R.* 20 *Ch. Div.* 1, furnishes a fresh point of departure for the more recent English cases. The decision of Fry, J., in that case was reversed by the Court of Appeals on a review of the evidence, Baggallay, L. J., remarking (*p* 23) that the vendee's investigation was of a most cursory character, which could not have enabled the defendant to ascertain the truth or falsity of the representation that had been made. *Atwood v. Small*, which was relied upon by the Court below, was considered and explained by Jessal, M. R., who concludes (*p.* 17): 'In no way, as it appears to me, does the decision, or any of the grounds of the decision in *Atwood v. Small*, support the proposition that it is a good defense to an action for the rescission of a contract on the ground of fraud, that the man who comes to set aside the contract inquired to a certain extent, but did it carelessly and inefficiently, and would, if he had used reasonable diligence, have discovered the fraud.'"

The decisions in this country, including Texas, show a like modification or departure from the strict rule declared in *Atwood v. Small*.

In some of the Texas cases cited by the plaintiff and Referee, the question here raised was not presented. In one or more the alleged representation was nothing more than the expression of opinion; in some the buyer knew the representation was not true; and in others the facts were as open and obvious to the buyer as to the seller—the means of knowledge were equally available to both.

In *Nolan v. Young (Tex. Civ. App.)*, 220 *S. W.* 154, however, it was distinctly held that if the buyer undertook to investigate and discover for himself the truth or falsity of the representation, whether invited or not, before the execution of the contract, he was bound by everything a proper investigation would disclose. This is the only Texas case, we think, that flatly sustains the principle declared in *Atwood v. Small*. It claims to follow *Foster v. Bennett (Tex. Civ. App.)*, 178 *S. W.* 1001, of the same state, but in that case the buyer requested a statement of the financial condition of the company, and a true statement was furnished, which the buyer took into another room, and an inspection of which would have contradicted the seller's representation.

Relative to false representations, as a ground of defense, there is one fundamental rule, agreed upon by all the authorities, viz., that a buyer shall not be precluded from relying on such representations unless it clearly appears that he relied on his own investigation, and not on the representation. Mr. Pomeroy, at *Section* 895, *Note* 4, states it thus:

"The question is, Did the party rely on the representation or on his own knowledge? To obviate the effect of the representation, it must be clearly and conclusively shown that he relied on his own knowledge. This, the general doctrine and the qualifications both demand."

The rule declared in *Atwood v. Small* is based, admittedly, on grounds of expediency. It being impossible to tell how much information the buyer obtained from the investigation he did make, it will be assumed that he obtained all that a complete investigation would have furnished. This rule may be of easy application, but it seems inconsistent with the fundamental rule, and calculated, in many cases, to aid the seller in escaping the consequences of his fraud, and defeating the ends of justice. The better and more reasonable doctrine, the one consistent with the fundamental rule, and supported by the majority of well-considered cases, including those in Texas, is this: The buyer will not be prevented from availing himself of false representations of the seller, unless he makes an investigation on his own account and it is of such character as to fully acquit him with the essential facts. If the buyer made an investigation that was free and unhampered, and conditions were such that he must have obtained the information he desired, or the facts he seeks to know were as obvious to him as to the seller, and their means of knowledge were equal, he is presumed to have relied on his own investigation, and not on the representation. In such case he could not have been misled by the seller.

This rule is supported by many well considered cases, including some cited by the plaintiff. A case much relied on by the plaintiff is *Southern Development Co. v. Silva* (1887), 125 *U. S.* 247, 8 *S. Ct.* 881, 31 *L. Ed.* 678. In this case, the representations were found by the Court to be, for the most part, mere expressions of opinion. No satisfactory case of fraudulent representation was made out. Some of the representations were known by the buyer to be untrue, and he relied on his own examination and inquiries. In *Farrar v. Churchill*, 135 *U. S.* 609, 10 *S. Ct.* 771, 34 *L. Ed.* 246, another leading case for plaintiff, the Court relied on the case last mentioned, and others, in one of which the Court said:

"The circumstances of the case may be such, as to make it incumbent on a court of justice to impute" to the buyer a knowledge of the result of his investigation.

In another it was said:

"Where the facts lie equally open to both vendor and vendee, with equal opportunities of examination, and the vendee undertakes to examine for himself, without relying on the statements of the vendor [etc.]."

In *Sullivan v. Helbing* (1924), 66 *Cal. App.* 478, 226 *P.* 803, the Court said:

"The mere circumstance that one makes an independent investigation or consults with others, does not necessarily show that he relied on his own judgment rather than upon the representations of the other party, nor does it give rise to a presumption of law to that effect."

In *Price v. Macauley*, 2 *De G. M. & G.* 339, 346, it was said by Lord Justice Knight Bruce:

"Supposing, however, that the defendant had actually known at the time of the purchase what were the real state and condition of the subject-matter of the contract, it may be that he would not be entitled to complain, but in order to enable a vendor to avail himself of that defense in such a case, he must show very clearly that the purchaser knew that to be untrue which was represented to him as true."

In *Robey v. Craig* (*Tex. Civ. App.*), 172 *S. W.* 203, the appellee averred that he was induced to execute the note sued on, as well as the rental contract, by the fraudulent representations of the appellant to the effect that the land was all tillable and in cultivation whereas thirty acres thereof were untillable and not in cultivation. The appellant replied that he told the appellee to inspect the land and satisfy himself, and that he did make such inspection before signing the note and rental contract. There could hardly be a case in which an investgation would have more readily shown the true facts, but the Texas Court held that the appellee was not precluded from relying on the representation as a defense.

In another Texas case, *Graves v. Haynes* (*Tex. Com. App.*), 231 *S. W.* 383, the Court said:

"If defendant in error believed such representations, and relied on them, and would not have purchased the cattle if they had not been made, he would not be denied his action, even though he did not rely solely on such representations, but relied in part on what he saw when he inspected the cattle."

This is the latest Texas case we have seen which turned upon an investigation made by the buyer, but there is a much later case,

*Hoyt v. First Nat. Bank* (*Tex. Civ. App.* 1922), 247 *S. W.* 637, in which the Texas cases are reviewed, and in which the Court, quoting Mr. Pomeroy (supra) stated the law in point substantially as stated in this opinion.

To the same effect is *Turner v. Houpt*, 53 *N. J. Eq.* 526, 33 *A.* 28. In that case the Court held that the means of knowledge for obtaining information touching the quality and quantity of the product of a coal mine were not at hand, and that complainants were without available opportunity to investigate for themselves.

Applying the rule which we regard as the correct one, to the facts of the present case, what is the result? Can it be said that the defendant knew, from the examination made by Besse before the contract was signed, how much oil and water Well No. 1 was producing? Did he know, from such examination, all the essential facts? Were conditions such at the time the examination was made that it must be assumed by the Court that Besse knew the facts covered by the plaintiff's representation? Does it clearly appear as a fact,. or presumption of law, that the defendant, in signing the contract, relied on its own knowledge of the property purhased, and not on plaintiff's representation respecting it? After all, that is the test.

Assuming, as we must, that the defendant was possessed of all the knowledge its agent, Besse, says he obtained by his examination, still we are not convinced that it is clearly and conclusively shown that the defendant relied on the examination and not on the alleged representation.

Under the law, as we have stated it, the Court must be so convinced before it can be said that no reliance was had on the representation.

Besse says he learned, by his examination, all that could be ascertained about the property, and was given the daily gauges and stock reports which would furnish the information respecting the production of oil and water from Well No. 1. He does not say what the daily production was. The defendant testified that the representation the plaintiff made to him, that the daily production

of oil from said well was around three hundred barrels was false. There is other testimony to the same effect.

The examination made by Besse was admittedly very brief. According to the testimony of Bryson, a witness for the plaintiff, who was present when Besse made his examination, it must have been of a very cursory character, only a general inspection of the lease. He says Besse made no gauge, but watched the tanks and the wells flow.

It is apparent from the evidence, not only that the examination made by Besse was cursory, but also that the facts were more in the knowledge of the seller than the buyer; that the means of knowledge were not equally available to both. Besse based his knowledge as to the production of Well No. 1 on the fact that he talked with the employees of the defendant, saw everything, and carefully examined the daily gauges and stock reports given to him by said employees, but it appears that gauges for several days were also presented by the plaintiff to the defendant personally, and they were found to show a daily production from Well No. 1 of about three hundred barrels. There is evidence other than that of the defendant, tending to show that the plaintiff's alleged representation respecting the oil production from said well was false. So that, manifestly, the Court cannot hold, as a fact, or as a conclusion of law, from the facts found by the Referee, that it is clearly and conclusively shown that defendant relied on his own knowledge and not on the representation. It is at least a debatable question.

The defendant insists that it cannot be assumed he relied wholly on his investigation because the representation was made after the investigation, he made no effort to verify its truthfulness, and was not required to do so. It is argued, therefore, that the case is, in that regard, similar to one where no examination had been made at all. We express no opinion on this point.

But the Referee does not base his conclusion entirely on the fact that the defendant made an examination on his own account and thereby learned the material facts, and neither does the lower court.

■■ There is a fact in the case, other than the investigation, which had much weight with the Referee and Superior Court in reaching the conclusion that the defendant was not induced to execute the contract by any representation of the plaintiff. We refer to the following provision in the contract of sale bearing date December 21, 1920:

"The property hereby agreed to be sold has been examined and inspected by the vendee, through its agent, and the same is hereby accepted in its present physical state, without any representations or warranties on the part of the said vendor, other than to its title thereto, and that Well No. 1 has not been shot."

We are not as much impressed as the Referee and Superior Court were with the legal effect of this admission on the part of the vendee, and are of the opinion that it alone would not preclude the defendant from relying on plaintiff's representation; it is not conclusive or controlling. It may, however, be regarded as a fact which, taken in connection with the investigation, tends to show that the defendant did not rely on the representation. If there had been no investigation, such admission would be entitled to little, if any, weight, if there was a false representation. It would be dangerous, in passing upon sales alleged to be fraudulent, to hold that the buyer is bound and concluded by such an admission. The law is so diligent in discovering fraud, and relieving against its consequences, when relied on as a defense, that an admission by the vendee that there was no fraud in the sale, even when there has been an independent investigation of the property by the vendee, will not prevent him from showing and relying upon fraud that was present in the making of the contract, and unknown to him at the time.

In the case of *J. I. Case Threshing Mach. Co. v. Webb* (*Tex. Civ. App.*), 181 *S. W.* 853, it was said:

"The provision of the contract above did not operate a denial of defendant's * * * right to show that false representations had been made to him by appellant's agent to induce him to enter into the contract."

In that case the defendant had acknowledged in the contract that he had received "a full, true and correct copy of the order, and that no provisions, representations or agreements have been made not herein contained."

The Court cited a case in which it was said:

"The provision in the bill of sale that 'it is understood that said stock is sold as it now stands, and the grantor does not warrant as to quantity,' does not preclude plaintiff from showing that he was induced to make the trade, and in so doing relied on the representations of the defendant." *Kirby v. Thurmond (Tex. Civ. App.)*, 152 *S. W.* 1102.

In *Pearson v. Dublin* (1907), *A. C.* 351, the Court used this language:

"Now it seems clear that no one can escape liability for his own fraudulent statements by inserting in a contract a clause that the other party shall not rely on them. * * * They contemplate honesty on both sides, and protect only against honest mistakes."

We come now to the second question raised by the assignments of error.

Almost a year after the contract was executed, and possession of the property delivered to the defendant, and when the plaintiff was strongly and threateningly insisting on the payment of one of the notes sued on, and provided for in the contract, an agreement dated December 12, 1921, was signed by the parties in which the plaintiff agreed to extend the time for the payment of the note upon defendant's depositing additional collateral; and in said agreement the defendant admitted that he was indebted to the plaintiff in the full amount of his claim. This was the "Extension Agreement" upon which much stress was laid at the argument.

It is not clear whether this admission of the defendant was regarded by plaintiff's counsel as an estoppel or waiver. The Referee says:

"It is not necessary to resort to any questions of estoppel, laches or ratification, for under all the facts the salutory rules of law would prevent the defendant from repudiating his transaction or making a defense against the obligation thereby created."

We are not satisfied that the admission amounts in law either to estoppel or waiver, but are of the opinion that it might be regarded as a fact which, taken in connection with the other facts, would tend to show that the defendant was not induced to sign the contract by any false representation of the plaintiff. But it would not conclude or prevent the defendant from showing and relying on such representation, if he was misled by it.

■ The defendant insists that his admission in the extension agreement has no significance or materiality because he did not know the representation was false until after he signed the agreement. And in reply to plaintiff's argument that he must have known all about the property at the time because he had had possession of it for almost a year, he says that Well No. 1 was shot almost immediately after the sale, and its production thereafter could be no indication of what it was when the representation was made. The Referee nevertheless found as a fact that at the time the extension agreement was signed "Clark was possessed of all the knowledge that he now has in relation to all the elements of fraud claimed by the defendant to have existed at the time of the making of the contract."

Such fact might be a very important one in the case, and perhaps, controlling, if the finding was warranted by the evidence. If at the time he made this admission the defendant had full knowledge of the fraud relied on, and knew at that time whether the representation was true or false, it would have much weight in deciding whether he relied on, and was deceived, by any false representation of the plaintiff.

But we do not find, after a careful examination of the record, any evidence which rebuts the testimony of the defendant, that he did not know when he signed the extension agreement that the representation was false. The Referee bases his conclusion, that the defendant had such knowledge, on the testimony of Bryson, Barwise and Odell which he says he cannot disregard. We have not found any testimony of those witnesses which shows that the defendant had, at the time he signed the extension agreement, all the knowledge respecting the alleged fraud that he could have had at any time thereafter. We feel constrained, therefore, to hold that this particular finding of fact is not warranted by the evidence.

■ Our conclusion is that the Referee did not find from the evidence that the defendant was not induced to execute the contract of sale by any representation of the plaintiff; neither did he find facts from which the law conclusively presumes the defendant was not so induced.

While the facts the Referee found may be regarded as evidence showing that the defendant could not rely on the representation, they do not clearly and conclusively show such fact specifically or as a conclusion of law.

In determining whether the law presumes there was no reliance by the defendant on the representation, the Court are confined to the facts the Referee did find, and basing our judgment on such facts, we are constrained to hold that there is no such presumption. It does not clearly and conclusively appear from the facts found that the defendant relied on his own examination and not on the representation. It may be that, from the facts found, including defendant's investigation and admissions, it can be argued that the defendant did not rely on the representation, but that is not enough. It must clearly appear as a fact, or conclusion of law. This, both the law and the stipulations of the parties required. Having failed to find the crucial and essential fact in the case, one way or the other, the Court are of the opinion that the case should be remanded for the purpose of determining whether the defendant was induced to sign the contract by any false and fraudulent representations of the plaintiff

The third question raised by the assignments of error involves the power of the Referee to make an award finding for the plaintiff in an amount in excess of the judgment entered in the Superior Court. Apparently, not much reliance was placed by the defendant on this point, and it is unnecessary to consider it at length.

We may say, however, that even if the judgment had been opened under Code provision (*Section* 4169) it is not certain that a new and different judgment might not have been entered after trial, in view of the language of the provision, which is as follows:

"Upon sufficient cause shown, the Court may open such judgment and let the defendant into a trial, security being first given, in manner and form as aforesaid, for the payment of such judgment, with interest and costs, as the plaintiff may recover in such action."

We are not required to decide that question, because the judgment here was not opened under said Code provision, but

under the stipulations of the parties. By *Paragraph* 1 of the stipulation, and the pleadings annexed, the scope of the original action was enlarged beyond the collection of the notes sued on. By the next paragraph it is provided that:

"The plaintiff shall set up and assert its claims and demands, and the defendant shall be let into its defense and counterclaim pursuant to the pleadings, hereto annexed."

*Paragraph* 3 of the stipulation provides:

"That the award of the Referee shall forthwith, upon filing the same in the Superior Court of the State of Delaware, in and for New Castle County, in said cause, be entered as a judgment of the Court in said cause whether said Court be in session or otherwise."

The plain intent of the stipulation is that the award of the Referee shall be for such sum as he found to be due and owing after hearing the evidence, and that judgment should be entered accordingly. The amount of the original judgment was necessarily reduced, because fees of plaintiff's counsel were reduced by the Referee from 10 to 5 per cent. There is no objection to this reduction and change in the amount of the judgment, but it is claimed that the judgment could not be increased. The specific objection seems to go to the manner of the calculation of interest by the Referee. The defendant contends that "the most the plaintiff can recover is the amount of the original judgment with interest from the date of its entry, and in any event the interest on the amount which is finally determined to be due the plaintiff, can only be calculated from the date the judgment was originally entered."

While the award of the Referee must be set aside, it is not because of the finding in favor of the appellee in excess of the judgment previously entered.

For the reasons stated in this opinion, the judgment of the Superior Court will be reversed.

RICHARDS, J., dissented.