117 A.2d 540 (1955)
Donald R. STEVENS, Plaintiff,
v.
Cecil H. JOHNSTON, Defendant.
Court of Chancery of Delaware, New Castle County.
November 3, 1955.
Wilfred J. Smith, Jr., Wilmington, for plaintiff.
Charles L. Paruszewski, Wilmington, for defendant.
MARVEL, Vice Chancellor.
Plaintiff seeks rescission of a contract of September 27, 1954, under the terms of which plaintiff for the sum of $6,200 purchased from defendant a section of an established newspaper route which defendant had been operating in Christiana Hundred for a period of almost two years. Defendant as did all other such agents in the Wilmington area purchased out of state newspapers from Delmar News Agency, the sole independent distributor of such papers in Delaware. Defendant also purchased from Delmar News Agency locally published daily newspapers, but the distribution of such papers by defendant represented a very small and unprofitable part of her business. The evidence discloses that while prior to September 27, 1954, defendant distributed approximately 3,000[1] newspapers, only 150 of these were dailies. Defendant's net profits arising from the sale of Delaware dailies averaged $1 or less weekly.
On Sunday, September 12, 1954, defendant placed an advertisement in the Philadelphia Inquirer which read as follows:

*541 "News agency, Wilmington area. Earns $300 weekly, Johnson, Wilm. 63688, 10A.M.-4P.M.
Plaintiff, whose principal occupation is that of trucker, and, who at the time was looking for a lucrative business which would make few demands on his time and strength and which could be expanded on his imminent retirement from the trucking business, telephoned defendant the following day. Defendant informed plaintiff in their telephone conversation that she wanted $18,000 for her business and a day or two later plaintiff and defendant met at defendant's place of business. At this meeting defendant discussed the earnings of the entire business and disclosed that she handled some 3,000 newspapers weekly, but it was not made clear to plaintiff that the advertised weekly earnings of $300 for the entire business were in effect gross earnings most of which were derived from high service charges for deliveries on the so-called "retail" route of the business on which defendant or her employees personally delivered papers. After this first meeting plaintiff went to defendant's supplier, the Delmar News Agency, and was informed that defendant did in fact purchase some 3,000 newspapers each week from that agency. Plaintiff also spoke to other newspaper agencies about the fairness of defendant's proposal. Several days later plaintiff accompanied by his son-in-law, Russell Finney, again visited defendant with the thought of a possible purchase by plaintiff and Mr. Finney inasmuch as plaintiff's resources were limited and he was not in a position to pay defendant's price of $18,000. After the workings of the business were explained, plaintiff and Mr. Finney gave up the thought of purchasing defendant's entire business but expressed interest in purchasing defendant's so-called "wholesale" route, which was that part of defendant's business in which the actual distribution and sale of newspapers was carried out by some 30 delivery boys after papers had been dropped at central distribution points. This operation involved sales to the individual delivery boys who in turn sold to householders and then accounted to defendant after pocketing their own profits. Under this plan of purchase it was understood that defendant would retain her so-called "retail" route on which she personally or through employees made deliveries and collections. Expenses of operation of the wholesale route were discussed and defendant claims that it was made clear to plaintiff that the hiring of a truck and driver for delivery of newspapers to points where they were picked up by delivery boys involved a weekly cost to defendant of $22.50 for Sunday deliveries and, $5 for daily deliveries. Defendant also contends that she explained a further necessary outlay of $2 for the rent of space for making collections. Undoubtedly these expenses were mentioned by defendant and discussed by the parties, but the testimony is in conflict as to whether the representations made by defendant as to estimated earnings of the wholesale route gave plaintiff a fair picture of what net earnings from operation of the route might be. I am satisfied that plaintiff made it clear that he was primarily interested in earnings which was not an unreasonable point of view considering the intangible nature of a newspaper route.
Plaintiff considered defendant's price of $8,000 for the wholesale route to be too high, and Mr. Finney having decided on plaintiff's suggestion not to take part in the proposed purchase, plaintiff on his own made a counter offer of $6,500,[2] subject to approval by the Delmar News Agency which approval was obtained on the day the contract was signed.
Plaintiff contends that during the negotiations which resulted in the signing of the contract of sale on September 27, defendant innocently or with intent to defraud represented that the so-called wholesale route earned $97 a week after payment of all expenses. Defendant insists that while she stated that the wholesale route "earned" *542 $92.30 she made it clear that operating expenses must be deducted from such gross earnings.
Courts should not disturb an agreement of sale reached after ordinary bargaining procedures merely because one party to the contract has been outbargained. However, I am not satisfied in the case at bar that the seller fairly represented a material matter, namely what the buyer might expect to earn from operation of the business he proposed to purchase. In her exposition of the rather complicated basis for the varying margins of profit on Philadelphia papers as opposed to papers from other cities, picking the date of May 20, 1954 on which gross earnings of $92.30 had been earned as a representative date, and in her assumption that plaintiff understood that representations about earnings meant gross earnings, I am convinced that defendant used her superior knowledge of the workings of a specialized business to draw plaintiff into a transaction which he did not fully understand. While it is clear that the sum of $300 used in the advertisement did not directly figure in the negotiations which culminated in the contract for the purchase of the wholesale route, yet it could not help but color plaintiff's bargaining approach. Defendant insists that the word "earnings" as used in the newspaper agency business means the difference between the cost of newspapers and the amount for which they are sold, but I do not think that plaintiff, who had had no experience in the business, can reasonably be expected to have so understood the term. Defendant's own account of her explanation to plaintiff of earnings of the wholesale route is lacking in clarity. There was no mention of the fact that defendant lost money in 1953, and the varying margins of profits on the various papers were not clearly explained. Defendant's margin of profit on Philadelphia Sunday papers, which were the mainstay of the business, appears to have been 2¢ or 2½¢ for some and 4½¢ for others, but it was not made clear as to exactly why this variation existed, although it does appear that service charges were based on what the traffic would bear. Sales of papers published in other cities such as New York, Baltimore and the District of Columbia and on which profits up to 8¢ per paper were made never totalled more than 150 per week. There seems to be no dispute about the fact that defendant purchased some 3,000 papers weekly from Delmar News Agency, but the number of these papers allocable to the wholesale route appears to vary. The so-called draw-sheet or allocation of papers to delivery boys for May 30, 1954, discloses a distribution of more than 2,500 newspapers on the wholesale route on that date, however, the draw-sheets from mid-September through the first Sunday in October of the same year disclose a distribution of approximately 2,000 papers on the same route. In her testimony defendant referred to both figures but based her explanation of earnings to plaintiff on the larger figure. Earnings of the route once plaintiff had taken over proved to be substantially below what he had reasonably anticipated and he promptly demanded rescission.
A court of equity will grant relief in the form of rescission even though the representations which induced the contract, while false, were not known to be false by the person making the statement, Eastern States Petroleum Co. Inc., v. Universal Oil Products, 24 Del.Ch. 11, 3 A.2d 768. Also the fact that a contract, as in the case at bar, contains a clause to the effect that all covenants, promises and agreements have been reduced to writing in the agreement does not foreclose a buyer from asserting that he was defrauded, Webster v. Palm Beach Ocean Realty Co., 16 Del. Ch. 15, 139 A. 457.
The information furnished by defendant to plaintiff prior to the sale did not, in my opinion, give plaintiff an accurate picture of the average weekly earnings of defendant's so-called wholesale newspaper route. This is not a case where the representations though false could or should not have been relied on and the fact that *543 plaintiff made some investigation is not controlling inasmuch as I am satisfied that plaintiff reasonably interpreted defendant's representations to mean that net earnings in excess of $90 weekly could be expected from the wholesale route, Kelly v. International Re-Insurance Corp., 20 Del.Ch. 184, 174 A. 267; Omar Oil & Gas Co. v. Mackenzie Oil Co., 3 W.W.Harr. 259, 138 A. 392. Also what might be considered mere matter of opinion when expressed to one in an equal bargaining position will be considered a misstatement of fact when stated by one with special or superior knowledge, Eastern States Petroleum Co. v. Universal Oil Products Co. Inc., supra.
Plaintiff also charges that defendant made misrepresentations about the time required for servicing the purchased route, but in view of the Court's conclusions above it is unnecessary to decide whether or not misrepresentations as to time were made, and if so, whether they were material.
Counsel may confer with the Court as to an appropriate form of order designed to restore to the extent possible the status quo existing prior to the sale.
NOTES
[1] While magazines were also sold from time to time, the number handled was negligible, the heart of the business being Sunday newspapers. No out of state dailies were handled.
[2] The final price agreed on was $6,200, arrived at by deducting $300 from the purchase price because of retention by defendant of one of the individual delivery boy routes located in the vicinity of defendant's retail route.